IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No. 13-cv-01192-RBJ-MEH

DAVID GUY BRYAN,

    Plaintiff,

v.

DAVE TESSIER, individual capacity, and
BRYAN HOFFMAN, official capacity,

    Defendants.

## ORDER

This case is before the Court on plaintiff's motion for summary judgment [ECF No. 80] and defendants' cross-motion for summary judgment [ECF No. 88]. Plaintiff's motion is denied. Defendant's defense of qualified immunity is granted, and final judgment will enter in favor of the defendant as directed.

## FACTS

The basic facts of this case were well summarized in Magistrate Judge Shaffer's recommendation of May 28, 2014. ECF No. 46. Judge Shaffer recommended that the Court grant in part and deny in part the defendant's motion to dismiss [ECF No. 28] and deny the plaintiff's motion for temporary restraining order [ECF No. 34]. I adopted and affirmed the recommendation on July 9, 2014. ECF No. 51. The only cause of action remaining in Mr. Bryan's suit is his Eighth Amendment claim that the withholding of medical equipment (an egg crate mattress) violated his right to be free from cruel and unusual punishment. ECF No. 51 at 8.

The following facts have not been disputed except as otherwise noted.

Mr. David Guy Bryan, an inmate at the Colorado Territorial Correctional Facility (CTCF) in Canon City, Colorado, brings this suit *pro se* pursuant to 42 U.S.C. § 1983. Mr. Bryan names Mr. Dave Tessier and Mr. Bryan Hoffman as defendants. ECF No. 46 at 1-2. Mr. Tessier was CTCF's Health Services Administrator (HSA) from March 15, 2012 to May 15, 2013. ECF No. 88-13 at ¶ 4. Mr. Hoffman succeeded Mr. Tessier as HSA on June 1, 2013. ECF No. 88-14 at 6. As successor, Mr. Hoffman is substituted for Mr. Tessier in the official capacity claim that remains in this action. ECF No. 51 at 2; *See* Fed. R. Civ. P. 25(d). The HSA serves as an administrator and is responsible for the supervision of clinical operations and staff. ECF No. 88-13 at ¶ 6. The HSA does not provide medical care. *Id.* at ¶ 7.

Decubitus Ulcer

In 1971, Mr. Bryan was in a car accident. ECF No. 80 at 3. As a result, he has a fused right hip, and his limited mobility renders him susceptible to decubitus ulcers on his coccyx (tailbone) region. ECF No. 1 at 6; ECF No. 46 at 2. Before he was incarcerated, that area was surgically repaired with a skin graft. ECF No. 71 at 4. A decubitus ulcer[1] is commonly known as a "bedsore," and it involves the breakdown of skin in a particular area. Depending on the severity of the ulcer, the wound can take many months to heal. ECF No. 88-12 at ¶¶15-17. Common treatments include the repositioning of patients in bed, regular skin inspection and assessment, meticulous wound care, and the use of pressure-relief surfaces. *Id.* at ¶¶21-22.

---

[1] Different factors can cause decubitus ulcers, including friction between skin and bed sheets, moisture, limited movement, decreased sensation, circulatory problems, poor nutrition, and age. Ulcers are classified by different degrees of severity. Stage one ulcers present signs of a surface-level bedsore, stage two impacts some depth of the skin layers, and stage three ulcers enter into the fatty tissue beneath the skin. *NPUAP Pressure Ulcer Stages/Categories,* THE NAT'L PRESSURE ULCER ADVISORY PANEL (last visited Sept.18, 2015), http://www.npuap.org/resources/educational-and-clinical-resources/npuap-pressure-ulcer-stagescategories/.

Egg Crate Mattress

Pressure-relief surfaces include mattresses made of different materials or pads placed on top of a mattress. Such mattress pads may be filled with water, air, gel, or foam. A foam egg crate mattress is such a pressure-relief tool. It is the Court's understanding that an egg crate mattress has a pattern of elevations and depressions, similar to the pattern of an egg crate.

Mr. Bryan entered the custody of the Colorado Department of Corrections (CDOC) in 1993. ECF No. 46 at 9. Following his incarceration, he alleges that CDOC physicians McGarry, Cabling, and Franz ordered or recommended his use of an egg crate mattress over a span of ten years. *Id.* Mr. Bryan was also issued a wedge pillow (another pressure-relief tool) for his bedsores. ECF No. 12 at 9; *and see* ECF No. 15 at 3.

Mr. Bryan was transferred to CTCF from Fort Lyon Correctional Facilities on April 28, 2011. ECF No. 1 at 17. After his transfer to CTCF, prison officials confiscated Mr. Bryan's egg crate mattress. ECF No. 12 at 9. On May 10, 2011, American with Disabilities Act (ADA) Inmate Coordinator Julie Russel revised Mr. Bryan's "accommodation list," which includes a list of permitted medical devices. ECF No. 46 at 2. Previously, this list had included "Egg-Crate mattress, Wedge Pillow, Extra long bed and Desk in cell that is not attached to the wall." *Id.* After the revision, Mr. Bryan's list of approved devices only contained "longer bed with bedding" and "Accessible desk in cell." ECF No. 31 at P 2.

Later in May 2011, despite the change in his accommodation list, Mr. Bryan was issued a new egg crate mattress. ECF No. 31 at 2. In early 2013, prison officials confiscated this mattress. ECF No. 88-14 at 4. Mr. Bryan was not reissued an egg crate mattress during the remainder of Mr. Tessier's tenure as HSA. ECF No. 46 at 9. Mr. Byran was reissued a mattress

on July 17, 2013 when a wound developed on his ankle. ECF No. 89-1 at 4. He maintained this mattress until January 3, 2014. *Id.*

There is a CDOC-wide policy regarding the use of egg crate mattresses. ECF No. 88-14 at 5. This policy permits the use of an egg crate mattress when a medical provider determines that it is medically necessary. *Id.* However, the policy limits the use of an egg crate mattress to use in the infirmary. *Id* The policy states:

> Medical supplies, such as egg crate mattresses, are limited for use by offenders who are confined to an infirmary or special medical unit and who meet clinically appropriate standards. Egg crate mattresses are not to be used by offenders in general population or administrative/punitive segregation, unless noted on the accommodation resolution form.

*Id.* Prison officials justify this policy on safety and security grounds. ECF No. 88-13 at ¶ 20. "Egg crate mattresses are not permitted in the general population areas of facilities because they present a great risk of fire hazard and because it may be a place for offenders to hide contraband." *Id.*

<u>Treatment of the Decubitus Ulcer during Mr. Tessier's Tenure</u>

On September 8, 2012, Mr. Bryan reported a skin breakdown on his coccyx. ECF No. 88-1 at 1. Mr. Bryan visited the infirmary was on September 11, 2012. *Id.* Clinician Savannah Martinez attended to Mr. Bryan, and she wrote:

> Explained to [patient] that we no longer recommend egg crate cushions as they can trap moisture and cause pressure ulcers. Recommended an overlay mattress or some type of off-loading mattress to help resolve wound. Expressed to [patient] that he must continue to off-load pressure from coccyx by turning frequently or propping up hip with wedge or pillow. ECF No. 43-3 at 18.

Bryan then requested a replacement egg crate mattress, but he did not receive one. ECF No. 31-1 at 11-12; ECF No. 88 at ¶ 145.

CTCF medical staff frequently examined and treated Mr. Bryan following his initial medical examination for his bedsore. During Mr. Tessier's tenure as HSA, the CTCF clinic

treated Mr. Bryan's ulcer approximately 130 times. ECF No. 88 at ¶147. On average, these visits occurred every 24 to 48 hours. During most visits, medical staff cleaned the wound and replaced the dressing. *See, e.g.,* ECF No. 88-1 at 1-29. In addition to ongoing treatment from the CTCF clinic, Mr. Bryan visited the St. Mary Corwin Wound Care Clinic (SMCWCC) in Pueblo, CO twice in 2013. ECF No. 88-14 at 2; *see also* ECF No. 89-1. CTCF medical staff recommended these visits. ECF No. 89-1 at 5.

Medical providers disagreed about the utility of an egg crate mattress as a component of Mr. Bryan's care. In 2013, Dr. Mark Wienpahl recommended use of "either an egg-crate mattress or some type of off-loading mattress." ECF No. 46 at 9. On his first visit to SMCWCC on January 4, 2013, Mr. Bryan alleges that the nurse who examined him recommended use of an "egg create mattress or a air actuated mattress." ECF No. 1 at 6. On January 28, 2013, Mr. Bryan requested a new egg crate mattress, but he did not receive one. ECF No. 88 at ¶75.

On his second visit to SMCWCC on March 27, 2013, Mr. Bryan saw a different medical provider who noted that his ulcer had improved since January 2013. ECF No. 43-3 at 18. The provider specifically recommended against the use of an egg crate mattress. *Id.* The provider's concern was that an egg crate mattress might trap moisture, and increased moisture could lead to a deterioration of the wound. *Id.*

When Mr. Tessier departed CTFC, the medical records show that Mr. Bryan's ulcer was not fully healed. ECF No. 88-6. However, the records show that Mr. Bryan's bed sore had improved from stage three on October 4, 2012 [ECF No. 88 at ¶11] to stage two on November 15, 2012 [*Id.* at ¶35] to stage one on May 17, 2013. *Id.* at ¶135.

<u>Treatment of the Decubitus Ulcer after Mr. Tessier's Tenure</u>

On July 17, 2013, Dr. Cynthia Ireland examined Mr. Bryan in the CTFC infirmary for a new ulcer that had developed on his ankle. ECF No. 88-7 at 11. Her assessment read "if we can get [the egg crate mattress] replaced, I think we can avoid worsening the current ulcer(s), and avoid the need for an air mattress." *Id.* Following that visit, Mr. Bryan did receive a full-length egg crate mattress, which he retained until January of 2014 when the ankle wound had largely resolved. ECF No. 88 at ¶151.

On June 11, 2014, Dr. Weinpahl noted that Mr. Bryan's condition "warrants a sleeping mattress that in some way reduces pressure more efficiently than the standard issue here. Either the eggcrate, or air mattress of some sort, or something." ECF No. 88-11 at 3. The CTCF's Chief Medical Officer (CMO), Dr. Andrew Martinez, examined Mr. Bryan and recommended that he be provided a pad to help with repositioning himself in bed. ECF No. 88 at ¶153. Mr. Bryan did receive such a pad on September 10, 2014, which measures 16-by-18 inches. *Id.* at ¶154. Mr. Bryan still retains that pad. *Id.* at ¶155.

On September 10, 2014, a CTCF provider recorded that Mr. Bryan's coccyx no longer had an "open area" although the skin remained "red and tough." ECF No. 88-10 at 14. On October 9, 2014 Dr. Martinez visited Mr. Bryan in his cell to examine this pad (sometimes referred to as a "short pad") and to "make an assessment" of Mr. Bryan's need for "a special mattress." ECF No. 71 at 11. Dr. Martinez personally observed that "there was no skin break down." *Id.* He determined that the short pad was sufficient. *Id.* Mr. Bryan continued to be seen in the CTCF clinic regularly for care on his decubitus ulcer through the end of 2014. ECF No. 88-11.

**STANDARD OF REVIEW**

The Court may grant summary judgment if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the burden to show that there is an absence of evidence to support the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* at 324. A fact is material "if under the substantive law it is essential to the proper disposition of the claim." *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998) (internal quotations and citations omitted). A material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

Mr. Tessier asserts that he is entitled to qualified immunity because Mr. Bryan has sued him only in his individual capacity. ECF No. 88 at 26. The qualified immunity doctrine "shields government officials performing discretionary functions from liability for damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Toevs v. Reid*, 646 F.3d 752, 755 (10th Cir. 2011) (internal quotations and citations omitted). When the defense asserts a qualified immunity defense, the summary judgment standard is subject to a "somewhat different analysis from other summary judgment rulings." *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006).

By asserting the defense of qualified immunity, Mr. Tessier "triggered a well-settled two fold burden" that Mr. Bryan is "compelled to shoulder." *Cox v. Glanz,* No. 14-5022, 2015 WL 5210607 at 10 (10th Cir. Sept. 8, 2015). If a defendant raises qualified immunity, the burden shifts to the plaintiff. *Medina v. Cram,* 252 F.3d 1124, 1128 (10th Cir. 2001) (internal quotations

and citations omitted). To overcome summary judgment based on qualified immunity, the plaintiff must satisfy a "heavy two-part burden." *Id.* The plaintiff "must show that the defendant's actions violated a specific statutory or constitutional right" and that the right was "clearly established at the time of the conduct at issue." *Steffey*, 461 F.3d at 1221. If a plaintiff does succeed in carrying is burden, the defendants then bear the burden of showing that there are no material issues of fact that would defeat their claim of qualified immunity. *Lighton v. University of Utah,* 209 F.3d 1213, 1221 (10th Cir. 2000).

When a case involves a pro se party, courts will "review his pleadings and other papers liberally and hold them to a less stringent standard than those drafted by attorneys." *Trackwell v. U.S. Government*, 472 F.3d 1242, 1243 (10th Cir. 2007). However, "it is not the proper function of the district court to assume the role of advocate for the pro se litigant." *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). A broad reading of a pro se plaintiff's pleadings "does not relieve the plaintiff of the burden of alleging sufficient facts on which a recognized legal claim could be based…conclusory allegations without supporting factual averments are insufficient to state a claim on which relief can be based." *Id.* Pro se parties must "follow the same rules of procedure that govern other litigants." *Nielsen v. Price*, 17 F.3d 1276, 1277 (10th Cir. 1994) (internal quotations and citations omitted).

## CONCLUSIONS

### I. Mr. Tessier's Qualified Immunity Defense

Prisoners, because of their confinement, cannot provide for their own medical care. "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994). The Supreme Court has held that the Eighth Amendment prohibits "unnecessary and

wanton infliction of pain," including "deliberate indifference to serious medical needs of prisoners." *Estelle v. Gamble,* 429 U.S. 97, 104 (1976).

### A. Constitutional Violation

The first prong of Mr. Bryan's burden in overcoming the qualified immunity defense requires the Court to determine whether the plaintiff "sufficiently asserted the violation of a constitutional right." *Lighton,* 209 F.3d at 1221. The plaintiff "must do more than abstractly identify an established right, but must specifically identify the right and conduct . . . which violated that right." *Steffey,* 461 F.3d at 1221. In effect, Mr. Bryan must first show enough evidence that could lead a reasonable jury to find that Mr. Tessier acted with deliberate indifference to Mr. Bryan's serious medical needs.

The test for deliberate indifference requires the satisfaction of both an objective and subjective component. *Mata v. Saiz,* 427 F.3d 745, 751 (10th Cir. 2005) (internal quotations and citations omitted). The objective component requires that the prisoner "produce objective evidence that the deprivation at issue was in fact 'sufficiently serious.'" *Id*. A medical need is sufficiently serious if "it is one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* The subjective component is satisfied when a prison official has a culpable mind, meaning that the official "knows of and disregards an excessive risk to inmate health or safety." *Id.* The Tenth Circuit has emphasized that "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. Deliberate indifference requires more than mere negligence." *Sealock v. Colorado,* 218 F.3d 1205, 1211 (10th Cir. 2000).

The subjective component is "akin to recklessness in the criminal law, where, to act

recklessly, a person must consciously disregard a substantial risk of serious harm." *Self v. Crum*, 439 F.3d 1227, 1231 (10th Cir. 2006) (internal citations and quotations omitted). Deliberate indifference is characterized by "obduracy and wantonness." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). A prison official acts with deliberate indifference "only if he knows that inmates face substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. However, "an inadvertent failure to provide medical care does not rise to a constitutional violation." *Martinez v. Beggs,* 563 F.3d 1082, 1088 (10th Cir. 2009) (internal quotations and citations omitted).

1. Objective Component

In order to satisfy the objective component, Mr. Bryan must allege[2] sufficient facts that the deprivation in question (the removal of and refusal to replace his egg crate mattress) caused him substantial harm. The Tenth Circuit has defined substantial harm as "lifelong handicap, permanent loss, or considerable pain." *Oxendine v. Kaplan*, 241 F.3d 1272, 1278 (10th Cir. 2001). The objective standard does not require proof of a permanent injury or a showing that the defendant caused the harm directly; it is sufficient to provide evidence that the medical need was serious or the delay or deprivation "unnecessarily prolonged appellant's pain and suffering." *Sealock,* 218 F.3d at 1210 n. 5. However, "not every twinge of pain suffered as the result of delay in medical care is actionable." *Id.* at 1210. The Tenth Circuit has held that "twelve hours of tormenting, debilitating pain accompanied by severe vomiting," and "considerable pain [experienced] while [a] finger continued to rot" constituted substantial harm. *Oxendine,* 241 F.3d at 1278 (internal quotations and citations omitted). Furthermore, "severe chest pain, a

---

[2] The Court is mindful that Mr. Bryan improperly attached sixty pages of exhibits to his Response to Motion to Dismiss. The Court only considers the allegations contained in Mr. Bryan's Amended Complaint, Response to Motion to Dismiss, Motion for Temporary Restraining Order, and Reply in support of Motion for Temporary Restraining Order, and the exhibits attached to the Defendant's Response to Motion for Temporary Restraining Order. ECF No. 56 at 8.

symptom consistent with a heart attack, is a serious medical condition under the objective prong." *Mata v. Saiz*, 427 F.3d 745, 754 (10th Cir. 2005).

Mr. Bryan claims that Mr. Tessier's denial of a new egg crate mattress resulted in "an open, painful and debilitating decubitus." ECF No. 12 at 9. It is undisputed that the onset of Mr. Bryan's decubitus ulcer coincided with his possession of an egg crate mattress in September 2012. However, Mr. Bryan alleges that he did not have a problem with ulcers until his egg crate "wore out" in fall 2011. ECF No. 89-1 at 3. That mattress had been issued in May 2011. ECF No. 31 at 2

In any § 1983 claim, causation is also a necessary element. *Daniels v. Gilbreath,* 668 F.2d 477, 488-89 (10th Cir.1982). A delay in medical care "only constitutes an Eighth Amendment violation where the plaintiff can show that the delay *resulted* in substantial harm." *Oxendine,* 241 F.3d at 1276 (emphasis added). The requirement of causation is not just "factual cause" but rather "legal causation which goes to the relationship to the injury and consequent liability." *Daniels,* 668 F.2d at 480-81 (internal quotations and citations omitted).

A worn out mattress could contribute to the development of a bedsore if the mattress was dilapidated enough to no longer relieve pressure on susceptible areas of Mr. Bryan's body. However, Mr. Bryan's claim that the mattress was "wore out" is largely undeveloped. Beyond his allegations in his deposition [ECF No. 89-1 at 3], Mr. Bryan does not present any evidence about how long an average mattress is expected to last. He does not provide any specific details about the condition of his mattress in September 2012 when the ulcer developed. Therefore, in the absence of additional evidence, a reasonable jury could not find that old mattress caused Mr. Bryan's initial skin breakdown.

Furthermore, Mr. Bryan alleges that the removal of his old mattress in January 2013 and

Mr. Tessier's refusal to grant him a new mattress caused him substantial harm. Mr. Bryan repeatedly requests a new egg crate mattress, but he does not offer specific examples of how the absence of the mattress caused him additional substantial harm. He alleges that he had never had a skin breakdown before September 2012. ECF No. 89-1 at 3. Mr. Bryan also claims that when he entered prison, he was "issued an egg-crate mattress by Medical Department/CDOC, and the decubitus healed in a very short time which demonstrates that using such an item will/or could resolve the healing process and can be used as a proactive/preventative item." ECF No. 80 at ¶2.

However, the medical records indicate that Mr. Bryan's bedsore was healing, albeit slowly, throughout the time when he did not possess an egg crate mattress. On January 10, 2013, Mr. Bryan indicated to Nurse Jones that there was "improvement" to his wound. ECF 88 at ¶63. On January 17, 2013, Nurse Rudnick changed Bryan's dressing and recorded "[w]ound is beginning to close at the top…" *Id.* at ¶67. On February 8, 2013, Nurse Bufmack changed Bryan's dressing and recorded that the wound "is slowly resolving [and has] no signs of infection." *Id.* at ¶85. On March 19, 2013, Nurse Havens recorded, "[t]he wound bed is healing, no signs and symptoms of infection." *Id.* At ¶109. On March 27, 2013, the provider at SMCWCC noted that Mr. Bryan's ulcer had improved since the first visit in January. *Id.* at ¶111. On April 13, 2013 Nurse Gritz noted that the wound was stable and free of complications. *Id.* at ¶123. On May 17, 2013, two days after Mr. Tessier's departure, Nurse Rogers recorded that although the ulcer was "chronic," it had now resolved to "stage 1." *Id.* at ¶135. On May 22, 2013, Nurse Pearl recorded that Mr. Bryan told her he believed "it's getting better." *Id.* at ¶138. This improvement in the absence of an egg crate mattress demonstrates that the medical need for one was not sufficiently serious.

Additionally, Mr. Bryan did receive an egg crate mattress in July 2013 for a different

ulcer. ECF No. 88-7 at 11. This occurred after Mr. Tessier's tenure, so it is not directly relevant to the claim here. However, a review of the medical records from when Mr. Bryan had this mattress assists the Court in determining whether an egg crate mattress would have helped accelerate the healing of Mr. Bryan's bedsore on his coccyx. The medical records do show that both the ulcer on the heel and the ulcer on the coccyx were generally improving during this time. However, the Court did not find any indication that the coccyx ulcer was healing more rapidly than it was before the issuance of the mattress in July 2013. *See* ECF No. 88-7; ECF No. 88-8; ECF No. 88-9.

A plaintiff must "go beyond the pleadings and designate specific facts so as to make a showing sufficient to establish the existence of an element essential to that party's case in order to survive summary judgment." *Sealock,* 218 F.3d at 1209. Even when liberally construing Mr. Bryan's pleadings, the record does not contain enough evidence that could permit a reasonable jury to find that the confiscation of the mattress rises to the level of a constitutional violation. The absence of a mattress does not appear to have conclusively prolonged Mr. Bryan's recovery or caused him additional severe pain. The Court finds that Mr. Bryan has not presented sufficient evidence to satisfy the objective prong of the deliberate indifference test. While acknowledging the pain and discomfort of a chronic decubitus ulcer, Mr. Bryan's evidence does not suggest that pain he experienced as a result of not having an egg crate mattress was of sufficient severity to be substantial.

    2. <u>Subjective Component</u>

Even if the deprivation of the egg crate mattress was sufficiently serious under the objective prong of the deliberate indifference test, Mr. Bryan would still need to satisfy the subjective prong. The subjective component "presents a high evidentiary hurdle to the plaintiffs:

a prison official must know about and disregard a substantial risk of serious harm. . . . A claim is therefore actionable only in cases where the need for additional treatment or referral to a medical specialist is obvious." *Self,* 439 F.3d at 1232. Here, Mr. Bryan would need to present evidence that could lead a reasonable jury to decide that Mr. Tessier had the requisite culpable mind.

In 2012, Mr. Bryan submitted two requests for a new egg crate mattress. The first was on September 15, 2012 when he requested a "new egg crate mattress as the one I have currently is wore out." ECF No. 31 at ¶12. He submitted a second request on September 28, 2012. *Id.* On September 28, 2012, Nurse Debbie Petroeske responded by writing on his second request: "Action Taken: Order - will take about 2 wks." *Id.* Mr. Bryan states that Nurse Petroeske later informed him "that she was told by Tessier to cancel the order for Egg-Crate Mattress." ECF No.31 at ¶12. Mr. Bryan asserts that "this is when Tessier wantonly and deliberately stopped the order." *Id.* Mr. Bryan claims that Tessier personally told him that "I will see to it that that [sic] your ADA accommodation will have the items removed and that you will not be issued these items." *Id.* at ¶16.

However, while the health records conclusively show that Mr. Bryan made multiple requests for an egg crate mattress, Mr. Bryan does not offer any additional evidence of Mr. Tessier denying such a request. Nothing in the record, beyond Mr. Bryan's undeveloped assertions in his Response to Motion to Dismiss [ECF No. 31], confirms that Mr. Tessier cancelled the orders for Mr. Bryan's mattress or affirmatively prohibited any other type of pressure-relieving tool. Furthermore, Mr. Tessier stated in his deposition that "Mr. Bryan wanted an egg crate mattress. However, at that time, Bryan did not have any clinical medical order for such a device to be re-issued." ECF No.88-13 at ¶11. Based on the Court's review of the record, it seems that the prison's decision to take away the mattress (and not give it back)

was not based on any medical recommendation but was due to a change in prison policy.

As Judge Shaffer writes in his recommendation, it is troubling that Mr. Bryan did not receive an egg crate mattress or, at minimum, an alternative mattress during Mr. Tessier's tenure. ECF No. 46 at 11. However, Mr. Hoffman stated in his deposition that "the determination regarding whether [the egg crate mattress] is medically appropriate for [Plaintiff], would be made by a medical clinician and approved by the [Chief Medical Officer.]" ECF. No. 43-3 at 4. The Court does not dispute that many medical staff recommended an egg crate or a substitute. ECF No. 46 at 11. However, it is not clear from the Court's review of the record that a provider actually issued a medical order for Mr. Bryant to receive an egg crate mattress (or a replacement) or if the providers were making mere recommendations for the CMO to review.

Furthermore, the Court finds it appropriate that, as non-medical supervisors, Mr. Tessier and Mr. Hoffman consulted with Dr. Martinez and relied on his opinion. Mr. Tessier stated that when answering Mr. Bryan's grievance, "I consulted with the Chief Medical Officer. I provided feedback to Mr. Bryan's provider(s) regarding what policy permitted and what other options they might pursue in consultation with the CMO." ECF No. 88-13 at ¶24. Absent additional evidence from Mr. Bryan, the non-issuance of an egg crate mattress or another replacement appears to be negligent at worst.

Ultimately, deliberate indifference is a high standard. There is a difference "between inadvertent failure to provide medical care and a deliberate indifference to serious medical needs. It is only the latter that can be said to form the basis for an action [that rises to a constitutional claim]." *Daniels,* 668 F.2d at 482. Although the Court sympathizes with Mr. Bryan, and although Mr. Tessier may have been negligent in not issuing an alternative mattress, Mr. Bryan's

evidence does not establish conduct by Mr. Tessier that rises to the level of wanton or reckless disregard for his health.

### B. Clearly Established Law

As Mr. Bryan has not provided sufficient evidence to lead a reasonable jury to decide that Mr. Tessier violated his Eighth Amendment rights, the Court need not decide whether those rights were clearly established in law at the time of the conduct. However, in the interest of completeness, the Court will briefly address the second prong of the qualified immunity analysis.

A right is clearly established if it would have been "clear to a reasonable officer that his conduct was unlawful under the circumstances presented." *Herrera v. City of Albuquerque*, 589 F.3d 1064, 1070 (10th Cir. 2009). In general, a rule is "clearly established" if there is a Supreme Court or Tenth Circuit decision on point, or if the clear weight of the authority from other courts has shown the law to be established. *Casey v. City of Federal Heights*, 509 F.3d 1278, 1284 (10th Cir. 2007). The Tenth Circuit has previously held that "there is little doubt that deliberate indifference to an inmate's serious medical need is a clearly established constitutional right." *Mata*, 427 F.3d at 749.

However, the plaintiff must satisfy both prongs of his burden to defeat a defense of qualified immunity. For the reasons stated above, Mr. Bryan has failed to offer sufficient evidence that shows that Mr. Tessier acted in deliberate indifference to a serious medical need. Mr. Bryan has not carried his burden, and Mr. Tessier's qualified immunity defense stands.

### II.   Defendants' Motion for Summary Judgment

In addition to the assertion of qualified immunity, the defendants' motion focuses on the subjective component of the deliberate indifference test. The defendants contend that Mr. Bryan cannot satisfy the subjective prong merely because he disagrees with the course of the medical

treatment provided, and neither defendant denied Mr. Bryan access to medical care. ECF No. 88 at 21–25. The defendants' legal arguments are not entirely persuasive. The central issue in the present case does not involve a disagreement between the plaintiff and his doctors. Rather, Mr. Bryan alleges that the prison officials, working in a supervisory administrative capacity, prevented him from receiving an egg crate mattress. He disagrees with the actions and policies of the defendants in the HSA role.

Additionally, the defendants focus on the amount of care that Mr. Bryan did receive for his bedsore. The defendants' motion dedicates substantial space to arguing that Mr. Bryan received ample care for his ulcer. The defendants rely on case law that establishes that a non-medical official "who serves solely as a gatekeeper for other medical personnel capable of treating the condition may be held liable under the deliberate indifference standard if she delays or refuses to fulfill that gatekeeper role." *Mata,* 427 F.3d at 751. The defendants argue that Mr. Tessier fully satisfied his "gatekeeping role" as the "'gate' kept by Tessier and Hoffman was wide open." ECF No. 88 at 24.

The Court does not dispute the frequency or quality of the treatments given. However, Mr. Bryan's claim is that he was unconstitutionally denied access to an egg crate mattress, not that he was unconstitutionally denied access to *any* medical care. Despite the weaknesses in the defendants' legal arguments, Mr. Bryan did not carry his burden in challenging Mr. Tessier's qualified immunity defense.

### III.  Plaintiff's Motion for Summary Judgment

As discussed above, Mr. Bryan has not offered sufficient evidence to find that there is not a dispute of material fact about either prong of the deliberate indifference test. The Court acknowledges that it is understandably frustrating to Mr. Bryan that he was not issued a medical

device that he believed would improve his persistent condition. The Court recognizes that Mr. Bryan's chronic bedsore must have been a very uncomfortable experience. However, the Court finds that Mr. Bryan as not produced sufficient evidence to overcome Mr. Tessier's defense of qualified immunity.

## IV.     Prospective Relief

As noted in this Court's previous order granting in part and denying in part defendants' earlier motion to dismiss, Mr. Bryan only brought a claim against Mr. Hoffman in his official capacity. ECF No. 51 at 9. Therefore, the plaintiff's claim against Mr. Hoffman is limited to prospective relief. *Id.* A plaintiff may present past injuries when establishing standing for retrospective relief, but "he must demonstrate a continuing injury to establish standing for prospective relief." *PETA v. Rasmussen,* 298 F.3d 1198, 1202 (10th Cir.2002). "Where a plaintiff seeks an injunction, his susceptibility to *continuing* injury is of particular importance—past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief if unaccompanied by any continuing, present adverse effects." *Jordan v. Sosa*, 654 F.3d 1012, 1024 (10th Cir. 2011) (emphasis in original) (internal citation, quotations, and alterations omitted). Furthermore, "a plaintiff's continued susceptibility to injury must be reasonably certain; a court will not entertain a claim for injunctive relief where the allegations take it into the area of speculation and conjecture." *Id.* at 1024–25.

Defendants argue that Mr. Bryan's claim for injunctive relief is moot because Mr. Bryan presently possesses the short pad and his "decubitus has essentially closed." ECF No. 88 at 28. Furthermore, defendants attest that Mr. Bryan's six-month trial of using a full-length egg crate in 2014 was "unsuccessful" because the coccyx bedsore did not heal during his possession of the mattress. *Id.*

While Mr. Bryan's ulcer has been very slow to heal, the most current medical records show that the bedsore is nearly resolved. Dr. Weinpahl examined Mr. Bryan on December 2, 2014, which was the last examination on record. Dr. Weinpahl's notes state that the ulcer has stabilized and that it is unlikely to fully heal without surgery. ECF No. 88-11 at 2. Dr. Weinpahl writes that the ulcer has been "present over two yrs, albeit indolently" and that "it [the ulcer] does not seem to be bothering him, and is not likely too risky for infection." *Id.* Dr. Weinpahl also records that the ulcer "appears static, not likely to close unless we do something to stir[3] it up." *Id.* Therefore, the status of Mr. Bryan's wound does not warrant prospective relief because it does not demonstrate a significant risk of continuing injury.

Additionally, as discussed above, the record is inconclusive as to whether the egg crate mattress is necessary in preventing or treating bedsores. The record indicates that Mr. Byran's coccyx ulcer first developed in September 2012 when he was in possession of an egg crate mattress (albeit one that was over one-year-old), that the ulcer was slowly healing during the time he was without such a mattress, and the six months when he had a mattress did not seem to rapidly accelerate the healing of the coccyx ulcer.

The standard for prospective relief requires a level of certainty that the relief sought will prevent continuing injury. Here, the relief sought is the provision of a full-length egg crate mattress. Without engaging in speculation, this Court cannot conclude that Mr. Bryan is any more susceptible to continuing injury without an egg crate mattress than in possession of one.

---

[3] To stir up a bedsore often means to remove damaged, dead, or infected tissue by debridement, which involves cutting away dead tissue. *Diseases and Conditions: Bedsores (pressure sores),* MAYO CLINIC (last visited Sept. 10, 2015), http://www.mayoclinic.org/diseases-conditions/bedsores/basics/treatment/con-20030848. Dr. Weinpahl's notes reflect that he was going to call the skin care surgeons about such debridement. ECF No. 88-11 at 2.

### III. ORDER

Plaintiff's motion for summary judgment [ECF No. 80] is DENIED. Defendants' motion for summary judgment [ECF No. 88] is GRANTED on the qualified immunity defense and the prospective relief claim. Judgment will enter in favor of the defendants, Mr. Dave Tessier in his individual capacity and Bryan Hoffman in his official capacity. Judgment will enter against the plaintiff, Mr. David Guy Brian.

DATED this 21st day of September, 2015.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge